IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JONATHAN MAGNESS,

*Plaintiff*,

v.

Civil No. ELH-16-2970

HARFORD COUNTY,

*Defendant*.

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Jonathan Magness has sued his former employer, Harford County (the "County"), under the Americans with Disabilities Act of 1990 ("ADA"), codified, as amended, at 42 U.S.C. §§ 12101 *et seq.*, and the Rehabilitation Act of 1973, codified, as amended, at 29 U.S.C. §§ 791 *et seq. See* ECF 14-2 ("Amended Complaint"). Magness alleges discrimination based on disability, hostile work environment, and retaliation. He avers, *inter alia*, that he is "learning disabled," has "a low IQ," and suffers from limited "neurological" and "cognitive functioning," which impair his ability to speak and to comprehend. *Id.* at 2l.

The County has moved to dismiss the Amended Complaint. ECF 17 ("Motion"). Plaintiff opposes the Motion (ECF 18, "Opposition"), and the County replied. ECF 19 ("Reply"). Subsequently, plaintiff filed a "Motion for Leave to File Surreply." ECF 20 ("Surreply Motion"). Defendant has not responded to the Surreply Motion (*see* Docket), and the time to do so has expired. *See* Local Rule 105.2.a ("[A]ll memoranda in opposition to a motion shall be filed within fourteen (14) days of the service of the motion . . . .").

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons stated below, I shall deny defendant's Motion in part and grant it in part. Additionally, I shall

deny plaintiff's Surreply Motion, as moot.

## I.  Factual and Procedural Background[1]

Magness, who was 40 years of age when he filed the Amended Complaint, asserts that he has a "low IQ" and is "learning disabled." ECF 14-2 at 2. He "has been diagnosed with cognitive impairments" that include "severe word retrieval difficulties," "expressive language delay," impaired language comprehension, and "severe articulation disorder." *Id.* These conditions impair plaintiff's "speech production" abilities. Magness also suffers from an "auditory processing disorder," has impaired "reading comprehension," and is unable to express himself in writing. *Id.* Moreover, Magness is "substantially limited" in the "functions of the brain," including "neurological" and "cognitive functioning." *Id.*

The County employs more than 500 people. *Id.* at 3. Plaintiff began working for the County in 1998. *Id.* Since that time, he has held several positions. *See id.* at 6-25. For each position, plaintiff was paid at an hourly rate and performed manual labor, such as "digging holes, repairing water and sewer lines," and working with "concrete and asphalt." *Id.* at 3, 7. During winter, Magness "plowed with a truck and manually shoveled" snow. *Id.* at 7. He also performed road crew work. *Id.* at 9.

Magness avers that "disability discrimination and harassment" against him "commenced in approximately 2007," when several of his supervisors began regularly to call him a "'retard'", "'dumb farmer'", "'idiot'", "'f------g idiot'", "'stupid'", "'dumb'", and "'asshole.'" ECF 14-2 at 6-7. The supervisors who made such comments included Crew Chief David Gosnell, Crew Chief

---

[1] As discussed, *infra*, in the posture of this case, I must presume the truth of the facts alleged by plaintiff. Also, as discussed, *infra*, the Court may consider exhibits appended to the suit.

George Dawson, Crew Leader Ginelle Johnson, Ed Kimmel, and "George K." ECF 14-2 at 6.[2] Nondisabled employees were not called such names. *Id.*

According to plaintiff, in view of "the discriminatory and harassing conduct of supervisors the County's employees "were empowered to taunt, tease and harass Mr. Magness due to his disabilities." *Id.* Two of Magness's coworkers "would smoke cigarettes on the job (although it was not allowed) and blow smoke in Mr. Magness's face." *Id.* at 6. Plaintiff does not identify the coworkers who engaged in such conduct.

In 2007, Magness was a Utility Worker in the Harford County Water and Sewer Department. *Id.* at 7-8. However, he "regularly asked to transfer . . . due to the disability discrimination and harassment" he experienced. *Id.* at 8. Plaintiff submitted applications to transfer positions and made "written and oral requests to be transferred." *Id.* However, an unidentified supervisor "refused to release Mr. Magness for a transfer." *Id.*

In June 2009, Matthew Rutherford filed suit in this Court under the Rehabilitation Act and the ADA. *See* CCB-9-1562, ECF 1. Magness was not a party to that litigation. *Id.* However, during mediation in that case, held on May 18, 2010, "Magness was identified as a person who was and/or had been being [sic] discriminated against by the Defendant on account of a 'mental' disability." ECF 14-2 at 4. He avers that "the discrimination against [him] intensified" after he was mentioned in the May 2010 mediation. ECF 14-2 at 4. Additionally, Magness states that he was fired by the County in November 2010, "about six months after the Rutherford mediation." ECF 14-2 at 4, 21.

In the interim, in August 2009, unnamed supervisors "misstated and made intentional errors about Mr. Magness's attendance" in an attempt to fire him. *Id.* at 8. However, the County

---

[2] Plaintiff provides no position titles for Kimmer or "George K." Nor does plaintiff provide a surname for "George K."

"rescinded its proposed termination" of plaintiff after he retained an attorney. *Id.*

In October 2009, Magness was transferred to a position with the Harford County Department of Highways. *Id.* at 9. Plaintiff does not state whether he applied for this transfer. As a result of the transfer, plaintiff was "demoted to a lower job classification — that of a laborer." *Id.* However, plaintiff's pay was not reduced. *Id.* Linda Rickey was plaintiff's new supervisor in the Department of Highways. *Id.* From the Amended Complaint, it appears that the transfer occurred after plaintiff raised claims of discrimination and harassment against County employees who worked in the Water and Sewer Department. *Id.*

On an unspecified date, Rickey and HR Director Scott Gibson placed plaintiff on a "supervised sick leave plan." *Id.* at 9. Plaintiff was told that "the sick leave plan" was responsive to his "attendance issues." *Id.* at 10. However, plaintiff contends that he did not have attendance issues. *Id.* Nor had plaintiff abused the County's sick leave policies. *Id.* Under the "supervised sick leave plan Rickey was "not to waive any lateness for Mr. Magness" and was to "promptly inform [Gibson] if Mr. Magness was one-minute late or missed a day from work . . . ." *Id.* 9-10. On unspecified dates, but after the "supervised sick leave plan" was implemented, plaintiff was twice late to work. *Id.* at 10. The first time he was late by approximately fifteen minutes, and the second time by approximately three minutes. *Id.* However, each time plaintiff had called the County to inform his supervisor that he would be a few minutes late. *Id.* Plaintiff received a written warning for each late arrival and was "placed on unpaid leave for which he has not received back pay. *Id.* at 11. Plaintiff provides no dates as to these incidents, however.

In January 2010, plaintiff transferred to the Division of Litter Control, where his duties related to the operations of a landfill. *Id.* at 11. Although plaintiff does not say so explicitly, it appears that he did not request this transfer. *Id.* He states that, by transferring him to the

Division of Litter Control, the County was "trying to 'park' its mentally disabled workers in the Landfill . . . ." *Id.*

Dale Johnson was plaintiff's supervisor in the Division of Litter Control and Ginelle Johnson was his Crew Leader. *Id.* at 11.[3] Plaintiff had two coworkers, Laura Costa and Gregg Henn, who "at various times, and with the knowledge and/or approval" of Ginelle, called plaintiff a "'dumb redneck'", "'stupid'", and "'dumb.'" *Id.* at 12. They also asked plaintiff, "'when are you going to talk right[?]'" *Id.* Additionally, Costa "made fun" of plaintiff's "speech impediment" by asking him to "repeat what he had just said."

On an unspecified date, plaintiff informed, *inter alia*, Rex McDowell, the Union Shop Steward, about "the discrimination and harassment" he experienced in the Division of Litter Control. *Id.* at 13. On May 24, 2010, McDowell met with Gibson and County Attorney Deborah Duvall. *Id.* At that meeting, McDowell stated that he was "aware" that Magness "was being harassed, bullied and picked on because of his disability." *Id.*

On May 26, 2010, Magness's parents received an anonymous handwritten letter, stating, ECF 14-2 at 14 (capitals in original): "JONATHAN MAGNESS BRAGS ABOUT HOW HE SLEEPS ON THE JOB IN HIS EMPLOY [sic] WITH HARFORD COUNTY GOVT. HE SAYS HE DOES SO BECAUE [sic] HE CAN WORK AT THE FAMILY FARM IN BEL AIR & HICKORY, I.E. HE RUNS THE EQUIPMENT AT NIGHT." The letter also indicated that it had been "Sent to [the] County Executive." *Id.* Plaintiff provided the County's HR director with the original letter. *Id.* According to plaintiff, the County did not investigate the incident. *Id.*

Plaintiff avers that, between June and November 2010, Henn and Costa "'doubled-down' on epithets and name calling directed against and about" Magness. *Id.* at 15. Plaintiff reported

---

[3] Because Dale Johnson and Ginelle Johnson have the same last name, I shall refer to them by their first names.

Henn and Costa to McDowell, who met with Gerald Scanlon, the Chief of Solid Waste for Harford County, to discuss the "disability-related discrimination and harassment." *Id.*

Ginelle gave Magness a verbal warning on July 2, 2010, as well as a written warning, after he left the job site and drove his personal truck to a nearby Wendy's restaurant to purchase lunch. *Id.* at 15-16. According to plaintiff, Costa laughed at him when he was being disciplined by Ginelle. *Id.* at 16. After counsel for plaintiff contacted Gibson, the verbal and written warnings were rescinded. *Id.* at 16-17. However, "harassment" against Magness "escalated" thereafter. *Id.* at 17.

On September 3, 2010, plaintiff went to the dump to unload trash. *Id.* at 18. There, he spoke with a County coworker, who was also Henn's girlfriend, and he referred to Henn as "'queer boy'" and "'bitch.'" *Id.* Plaintiff had previously heard this coworker use such "vulgar language." *Id.* However, the coworker immediately reported Magness's statements by calling "an employee hotline." *Id.* Within hours, plaintiff met with an unidentified "HR Representative" to discuss the incident. *Id.* Magness apologized but was not permitted to "explain what he meant by using the at-issue term[s]." *Id.*

Although the County had "previously agreed" that plaintiff was to have a "designated 'advocate' present in any meeting with HR" as "an accommodation for his known disability plaintiff's designated advocate was not at the meeting on September 3, 2010. *Id.* at 19.[4] Defendant did not permit plaintiff to ask his designated advocate to come to the meeting. *Id.* Nor did defendant ask the designated advocate to attend the meeting. *Id.*

After the meeting of September 3, 2010, the County interviewed two of plaintiff's colleagues. The first colleague, who is identified by plaintiff as "CW1 indicated that she did not

---

[4] Plaintiff notes that, at the time of the September 3, 2010 meeting, his designated advocate was his mother, Sondra Magness. ECF 14-2 at 19.

believe Magness had intended to "disparage" Henn during the incident at the dump on September 3, 2010. *Id.* at 20. The second colleague, identified as "CW2 reported that "Magness had complained" about Ginelle harassing him. *Id.*

On October 19, 2010, Gibson informed plaintiff that he "should be terminated for the claimed inappropriate language." *Id.* at 19. By letter dated October 27, 2010, the County notified plaintiff that he would be terminated, effective November 1, 2010. *Id.* at 21.

Magness filed a charge of discrimination with the Maryland Commission on Human Relations[5] in January 2011 ("First Charge"), naming the "Harford County Government" as the respondent. *See* ECF 14-2 at 4-5; *see also* ECF 1-1 (January 2011 Charge). In the First Charge, he marked boxes for retaliation and discrimination based on disability. ECF 1-1. He also indicated that the "[e]arliest" date on which discrimination occurred was January 1, 2007, and the "[l]attest" date of discrimination was November 1, 2010. *Id.* Plaintiff did not check the box to indicate that he was alleging a "continuing action." *Id.*[6]

In the portion of the First Charge dedicated to the "particulars" of plaintiff's claims, Magness stated, *id.*:

> I. I began my employment with above named employer June 3, 1998. My position was Laborer. Beginning in 2007, I was continuously harassed by supervisors and co-workers. I was called names such as "retard, dumb farmer, idiot, asshole and fucking retard." I was continuously taken

---

[5] The Commission was previously known as the Maryland Commission on Human Relations. During the 2011 legislative session, the Maryland General Assembly approved a change in the name; it is now known as the Commission on Civil Rights. *See* 2011 Md. Laws, Chap. 580; *see also Bd. of Directors of Cameron Grove Condo., II v. State Comm'n on Human Relations*, 431 Md. 61, 64 n.3, 63 A.3d 1064, 1066 n.3 (2013).

[6] Although plaintiff does not attach a copy of the First Charge to his Amended Complaint (ECF 14-2), a copy was submitted with the initial Complaint. *See* ECF 1-1. The Amended Complaint incorporates the First Charge. *See* ECF 14-2 at 4-5 (citing and quoting the First Charge). Moreover, the County refers to the First Charge in its Motion. *See* ECF 17-1 at 4 n.2, 5. Therefore, I may consider the First Charge.

advantage of and disciplined inappropriately because of my disability. On or about May 18, 2010, my name was brought up in a discrimination investigation; thereafter the harassment intensified. On May 26, 2010, a letter was sent to my home with untrue and career damaging allegations. Co-workers were told to watch out for me. Supervisors began to target me for disciplinary action. I was not given appropriate work equipment to do my job. On or about September 3, 2010, I was interrogated without reasonable accommodation of having my advocate present. On November 1, 2010, I was discharged.

II. I was given no reason for denial of reasonable accommodation with regard to my disability. I was discharged for using derogatory comments.

III. I believe I have been discriminated against because of my disability in violation of the Americans with Disabilities Act Amendments Act of 2008, with respect to harassment, discharge and reasonable accommodation. In addition I believe I have been retaliated against for engaging in a protected activity with respect to harassment and discharge.

A "public hearing" about plaintiff's termination was set for January 25, 2011. *Id.* at 22. However, "four days before" the hearing, the County rescinded plaintiff's termination. *Id.* Magness alleges that after he was reinstated in January 2011, Ginelle "continually 'stared [him] down.'" *Id.* at 22. He also avers that, because of his disability, the County did not permit him to drive a County vehicle after he was reinstated. *Id.* at 22.

Beginning in 2012, Magness "formally applied for at least 17 different positions within the County Government" and made "numerous informal attempts at transferring." *Id.* at 23; *see also* ECF 1-4 (listing the positions for which plaintiff submitted formal applications).[7] According to plaintiff, the County has "allowed other employees to transfer to positions without submitting formal applications, without requiring an interview, and/or without any job announcement for the transferred-into position." ECF 14-2 at 23.

---

[7] The Amended Compliant does not include an exhibit listing the positions for which plaintiff formally applied. *See* ECF 14-2. However, the list was submitted as an exhibit to the initial Complaint. *See* ECF 1-4. Plaintiff refers to the list in the Amended Complaint (*see* ECF 14-2 at 23) and defendant refers to it in the Motion. *See* ECF 17-1 at 3, 5-6. Therefore, I may consider the list (ECF 1-4).

The Equal Employment Opportunity Commission ("EEOC") issued a "Determination" on April 30, 2014, pertaining to plaintiff's First Charge. *See* ECF 1-2.[8] The Determination stated, in part, ECF 1-2 at 3: "[T]here is reasonable cause to believe [Magness] was subjected to harassment, a hostile work environment, discipline, unequal terms and conditions of employment, discharge, and denied reasonable accommodation because of his disability and in retaliation for engaging in protected activity," in violation of the ADA. The Determination also indicated that the EEOC would initiate settlement discussions between the parties. *Id.* However, the parties did not reach conciliation. *See* ECF 1-3 (Notice of Right to Sue).[9]

In June 2014, the County returned Magness to a position under the direct supervision of Ginelle. ECF 14-2 at 23. Plaintiff does not specify the title of the new position. Nor does he provide the date on which he started the position. However, he states that on June 10, 2014, he objected, in writing, to the reassignment. *Id.*

In July 2015, the County "'outsourced'" the "Landfill, Mulch, and Compost work within the Department of Solid Waste where plaintiff was then working. *Id.* at 23. Plaintiff does not expound on the details of the outsourcing. However, plaintiff states that he was terminated from employment with the County as a result of the outsourcing. ECF 14-2 at 23.

Following plaintiff's termination, Magness "applied for and/or expressed interest in several positions outside the Department of Solid Waste." *Id.* at 24; *see also* ECF 1-4. Magness was not hired, notwithstanding that he was allegedly qualified for the positions. ECF 14-2 at 24.

---

[8] Magness did not attach a copy of the Determination to his Amended Complaint. *See* ECF 14-2. But, a copy of it was submitted with the initial Complaint. *See* ECF 1-2. And, the Amended Complaint incorporates the Determination. *See* ECF 14-2 at 5 (citing and quoting the Determination). Accordingly, I shall consider ECF 1-2.

[9] Although plaintiff did not submit the Notice of Right to Sue as an exhibit to the Amended Complaint (*see* ECF 14-2), he submitted it with the initial Complaint (ECF 1-3), and incorporates it here. *See* ECF 14-2 at 6.

Yet, "[o]f the approximate 26 hourly paid employees whom [sic] lost their jobs, Defendant has found jobs for all of them except for Mr. Magness and another person who was one of the oldest workers in an adversely affected hourly position." *Id.* at 24. Plaintiff avers that the County "hired nondisabled persons for the positions for which Mr. Magness applied and for which Mr. Magness was better qualified." *Id.* Moreover, he states that the County "made positions available for other nondisabled workers or workers who did not complain about discrimination and who had been laid off, without postings or with the decision already made to hire certain workers without any legitimate competitive process." *Id.* at 25.

By letter dated June 9, 2016 (ECF 1-3), plaintiff was issued a Notice of Right to Sue as to his First Charge. Plaintiff timely filed suit on August 25, 2016. ECF 1 ("Complaint").

In August 2016, plaintiff filed an additional charge of discrimination ("Second Charge"), naming the County as the respondent. *See* ECF 14-2 at 25; *see also* ECF 14-3 (Second Charge, signed by plaintiff on July 13, 2016). Magness checked the boxes for claims of retaliation and discrimination based on disability. *Id.* Additionally, he identified January 1, 2015, as the "earliest date" on which discrimination took place against him, stated that the discrimination was "ongoing and marked a box to allege a "continuing action." *Id.* In the portion of the Second Charge reserved for a description of his claims, plaintiff stated, in part, *id.*:

1. The EEOC has previously determined that Respondent discriminated and retaliated against me. Since I filed my initial Charge, I have continued to object to the disability harassment, discrimination and retaliation against me by Respondent.
2. Respondent terminated me in 2015. Before my termination, I expressed interest in transferring to several positions. After I was terminated, I applied for numerous positions. Respondent refused to rehire me and to transfer me to any other position.
3. Respondent did not hire me for the applied-for positions because of my disability and in retaliation for me engaging in protected activity and opposition.
4. Non-disabled persons and/or persons who did not engage in in [sic] protected

activity were hired for the positions for which I applied. Persons with less experience, seniority, and qualifications were hired for the positions denied to me.

5. Respondent has failed to comply with its own policies and procedures in the processing [of] my application for employment.

6. The disability discrimination and retaliation is a continuing violation. . . .

By letter dated May 11, 2017 (ECF 14-4), a Notice of Right to Sue was issued as to the Second Charge. Magness timely filed an Amended Complaint on May 18, 2017, adding allegations relevant to the Second Charge. *See* ECF 14-2.[10]

Additional facts are included in the Discussion.[11]

## II.  Standard of Review

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a

---

[10] The Amended Complaint does not specify whether the ADA claim for hostile work environment arises from the First Charge, the Second Charge, or both. *See* ECF 14-2 at 27-28. However, defendant raises no argument as to the ADA claim for hostile work environment. *See* ECF 17.

[11] At the request of the parties, this case was stayed pending resolution by the EEOC of the Second Charge filed by plaintiff. *See* ECF 7; ECF 8; ECF 9; ECF 11; ECF 13. Upon the filing of the Amended Complaint, the stay should have been lifted. Unfortunately, the docket continued to reflect that the case was stayed, which contributed to a delay in the resolution of the motions.

"short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, ___ U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d

435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not

expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger*, 510 F.3d 442, 450 (4th Cir. 2007). However, a court may properly consider documents incorporated into the complaint or attached to the motion to dismiss, "'so long as they are integral to the complaint and authentic.'" *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir.2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004).

Accordingly, when resolving a Rule 12(b)(6) motion, a court may consider exhibits, without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits . . . ." *Goines*, 822 F.3d at 166 (citations omitted); *see also U.S. ex rel. Oberg*, 745 F.3d at 136; *Anand*, 754 F.3d at 198; *Am. Chiropractic Ass'n*, 367 F.3d at 234; *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the

contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *petition for cert. filed*, No. 17-492 (Oct. 3, 2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

As noted, plaintiff submitted several exhibits with the original Complaint. *See* ECF 1-1 (First Charge); ECF 1-2 (EEOC's Determination, dated April 30, 2014); ECF 1-3 (Notice of Right to Sue, dated June 9, 2016, pertaining to the First Charge); ECF 1-4 (list of positions for which plaintiff formally applied, beginning in August 2012). These exhibits were submitted with plaintiff's initial Complaint (ECF 1) and have been incorporated into the Amended Complaint. *See* ECF 14-2 at 4-5 (citing and quoting ECF 1-1); *id.* at 5 (citing and quoting ECF 1-2); *id.* at 6 (citing ECF 1-3); *id.* at 23 (citing ECF 1-4). Because these exhibits have been incorporated into the Amended Complaint, I may consider them without converting the Motion to one for summary judgment. *See, e.g.*, *Goines*, 822 F.3d at 166. Additionally, plaintiff submitted two other exhibits with the Amended Complaint. *See* ECF 14-3 (Second Charge); ECF 14-4 (Notice of Right to Sue, dated May 11, 2017, pertaining to the Second Charge).

The exhibits are integral to the suit. *See* ECF 14-2 at 25 (citing ECF 14-3); *id.* (citing ECF 14-4). Therefore, I may consider them, without converting the Motion to one for summary

judgment.

## III.    Discussion

### A.    The Motion to Dismiss

As noted, Magness alleges that he was subjected to discrimination based on disability, hostile work environment, and retaliation, in violation of the ADA and the Rehabilitation Act. *See* ECF 14-2.   In its Motion, the County argues that plaintiff's claims under the ADA and Rehabilitation Act are subject to dismissal because the First Charge and the Second Charge were untimely filed.   *See* ECF 17-1 at 4-6.   For the reasons explained below, defendant's argument is largely without merit.

### 1.   The ADA

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." § 12101(b)(2).   The ADA contains five titles:  Title I, Employment; Title II, Public Services; Title III Public Accommodations; Title IV, Telecommunications; and Title V, Miscellaneous Provisions.

Notably, plaintiff does not specify the ADA Title on which his ADA claims are based. *See* ECF 14-2.   Based on my review of the Amended Complaint, it appears that Title I and Title II are the most relevant.   And, as discussed, *infra*, it seems that the suit is based on Title I.

Title I prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a); *see also Summers v. Altarum Inst., Corp.*, 740 F.3d 325,

328 (4th Cir. 2014) ("The ADA makes it unlawful for covered employers to 'discriminate against a qualified individual on the basis of disability.'").  A "qualified individual" is defined as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  § 12111(8).  Unlawful discrimination under Title I of the ADA "can include the failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee. . . .'"  *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013) (quoting § 12112(b)(5)(A)).  Moreover, "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability" may qualify as "discrimination against a qualified individual on the basis of disability." § 12112(b)(5)(B).

Title II of the ADA prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability."  § 12132.  Under Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  § 12131(2); *see also Seremeth v. Bd. of Cty. Comm'rs of Frederick Cty.*, 673 F.3d 333, 338 (4th Cir. 2012).

Notably, Title I adopts the administrative exhaustion requirement found in Title VII of the Civil Rights Act of 1964 ("Title VII"), codified, as amended, at 42 U.S.C. §§ 2000e-5 *et seq.*

This requires an employee to file an administrative charge of discrimination before proceeding to federal court. *See* 42 U.S.C. § 12117(a); *see also Sydnor v. Fairfax Cty., Va.*, 681 F.3d 591, 593 (4th Cir. 2012). Under Title I of the ADA, a plaintiff must commence a court action within ninety days of receipt of his notice of right to sue from the EEOC. *See* 42 U.S.C. § 12117; *see also Cepada v. Bd. of Educ. of Balt. Cty.*, WDQ-10-0537, 2010 WL 3824221, at *3 (D. Md. Sept. 27, 2010) ("[T]he 90-day [limitations] period begins on the date the claimant receives the right-to-sue letter.").

Title II of the ADA does not require administrative exhaustion. *See* 28 C.F.R. § 35.172(d) ("At any time, the complainant may file a private suit pursuant to section 203 of the Act, 42 U.S.C. 12133, whether or not the designated agency finds a violation."); *see also Johnson v. Balt. City. Police Dept.*, ELH-12-2519, 2014 WL 1281602, at *6 (D. Md. Mar. 27, 2014) (noting that the "exhaustion requirement does not apply to Title II of the ADA"); *Pisani v. Balt. City Police Dept.*, WDQ-12-1654, 2013 WL 4176956, at *6 (D. Md. Aug. 14, 2013) (internal quotation marks omitted) ("Whether Title I or II governs discrimination claims is often contested because Title I incorporates administrative prerequisites that are not required under Title II."); *Jarboe v. Md. Dept. of Pub. Safety & Corr. Servs.*, ELH-12-572, 2013 WL 1010357, at *6 (D. Md. Mar. 13, 2013) ("Neither Title II of the ADA nor § 504 of the Rehabilitation Act contains a requirement of exhaustion of administrative remedies by private litigants."); *Lucas v. Henrico Cty. Sch. Bd.*, 822 F. Supp. 2d 589, 604 (E.D. Va. 2011) ("Title II of the ADA . . . does not require exhaustion prior to bringing suit."); *Allen v. Hamm*, RDB-5-879, 2006 WL 436054, at *5 (D. Md. Feb. 22, 2006) ("Title I incorporates administrative prerequisites that are not required under Title II."), *aff'd*, 226 F. App'x 264 (4th Cir. 2007) (per curiam), *cert. denied sub nom. Blades v. Hamm*, 552 U.S. 951 (2007); *Pathways Psychosocial v. Town of Leonardtown,*

*MD*, 223 F. Supp. 2d 699, 713 (D. Md. 2002) ("Title II of the ADA does not contain an administrative exhaustion requirement.").

On at least two occasions, courts in this District have addressed allegations in which it was unclear whether an ADA claim was brought under Title I, Title II, or both. The case of *Allen*, *supra*, 2006 WL 436054, is instructive. The plaintiffs in *Allen* challenged the Baltimore Police Department's ("BPD") light duty policy. They cited Title II of the ADA in the complaint, but based their legal argument on Title I of the ADA. *Id.* The district court observed that the question of whether Title I or Title II applies "is often contested because Title I incorporates administrative prerequisites that are not required under Title II." *Id.* However, the plaintiffs' compliance with the administrative exhaustion requirement was "no longer at issue." *Id.*[12] Accordingly, the district court concluded that it "need not decide whether Title II of the ADA permits Plaintiffs to bring employment discrimination claims against the Police Department." *Id.* Rather, it "assume[d] without deciding that Plaintiffs may bring employment discrimination claims against the Police Department under Title II, and analyze[d] those claims under the language and precedent of Title I of the ADA." *See id.* (citation omitted). Applying those standards, the district court granted summary judgment to the defendants, without any further reference to exhaustion or Title II of the ADA. *See id.* at *13.

Similarly, in *Pisani*, *supra*, 2013 WL 4176956, it was "unclear whether [the plaintiff's] disability discrimination claim [arose] under Title I or II of the ADA, or both." *Id.* at *6 (footnotes omitted). However, the court determined that it was unnecessary to decide that question because the relevant legal standards at the motion to dismiss stage were no different

---

[12] The district court observed in a footnote that "Plaintiffs' counsel represent[ed] that the EEOC has issued right-to-sue letters to each of the remaining Plaintiffs", and that defendants had conceded "that their argument with respect to exhaustion of administrative remedies is now moot as to" one particular plaintiff. *Allen*, 2006 WL 436054, at *5 n.7.

with respect to the two provisions. *See id.* Although the defendants had argued that the plaintiff failed to exhaust administrative remedies, neither party had attached the charge of discrimination to the pleadings, and thus the court concluded that the exhaustion issue could be addressed only after the defendants obtained the charge of discrimination through discovery. *Id.* at *3, *6 n.13. As such, the distinction between Title I and Title II of the ADA on the question of exhaustion was irrelevant to the court's analysis of the defendants' motion to dismiss. *See id.* at *6 (citing *Allen*, 2006 WL 436054, at *5) ("[T]he Court need not determine whether Pisani intended to sue for employment discrimination under Title I or II, and, if he intended to sue under Title II, whether his claim is cognizable.").

In this case, unlike in *Allen* or *Pisani*, the defendant has raised exhaustion as an issue, and therefore the distinction between Title I and Title II is of potential significance. However, plaintiff argues that the exhaustion requirement was satisfied here; he does not argue that the requirement is inapplicable to his ADA claims of hostile work environment or discrimination based on disability. *See* ECF 18. From this, I glean that plaintiff's claim arises under Title I, because Title II has no exhaustion requirement. As such, Title VII exhaustion requirements apply.

With regard to Title VII exhaustion, an aggrieved person must file a charge with the EEOC within 180 days of the alleged discrimination, except in a "deferral" jurisdiction, where the period is 300 days. *See* 42 U.S.C. § 2000e-5(e)(1); *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 & n.3 (4th Cir. 2002). Maryland is a deferral state. And, the Maryland Commission on Civil Rights is the applicable State enforcement agency. *See, e.g.*, *Dewitt v. Clean Harbors Envtl. Servs., Inc.*, RDB-16-1705, 2017 WL 3116609, at *3 (D. Md. July 21, 2017).

The "exhaustion requirement ensures that the employer is put on notice of the alleged

violations so that the matter can be resolved out of court if possible." *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005); *see also Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 670 (4th Cir. 2015) ("We recognize that a primary objective of exhaustion requirements is to put parties on notice of the allegations against them."). The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, together with the agency investigation and settlement process it initiates, the requirement "'reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013) (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)). "Allowing [the EEOC] first crack at these cases respects Congress's intent . . . ." *Sydnor*, 681 F.3d at 593.

The exhaustion requirement functions as a jurisdictional bar in federal court, when a plaintiff has failed to comply with it. An aggrieved party who fails to comply with the applicable administrative procedures has failed to exhaust his administrative remedies and is generally barred from filing suit. *See, e.g.*, *Balas*, 711 F.3d at 406 ("[F]ederal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust administrative remedies."); *Miles*, 429 F.3d at 491; *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). Failure to comply generally mandates dismissal of the suit. *Lorenzo v. Rumsfeld*, 456 F. Supp. 2d 731, 734 (E.D. Va. 2006) (citing *Zografov v. Veterans Admin. Med. Ctr.*, 779 F.2d 967, 970 (4th Cir. 1985)).

Even when a plaintiff has filed a claim with the EEOC, a court cannot consider matters that were not properly raised during the EEOC process. To determine whether a plaintiff has

"properly alleged [a claim] before the EEOC" in a manner satisfying the exhaustion requirement, courts "may look *only* to the charge filed with that agency." *Balas*, 711 F.3d at 408 (emphasis added); *see also Chacko*, 429 F.3d at 506 ("This charge frames the scope of future litigation."); *Evans v. Tech.'s Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996) ("The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint."). Although courts "recognize that EEOC charges often are not completed by lawyers and as such must be construed with utmost liberality courts are "not at liberty to read into administrative charges allegations they do not contain." *Balas*, 711 F.3d at 408 (citations and quotation marks omitted). Rather, courts are constrained by the four corners of the charge and the inference of "'any charges that would naturally have arisen from an investigation thereof . . . .'" *Id*. at 407-08 (citations omitted).

"The touchstone for exhaustion is whether plaintiff's administrative and judicial claims are 'reasonably related,' not precisely the same . . . ." *Sydnor*, 681 F.3d at 595. The Court explained in *Sydnor*, 681 F.3d at 594: "[A]n administrative charge of discrimination does not strictly limit a Title VII suit which may follow. Instead, so long as a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, she may advance such claims in her subsequent civil suit." *See also Southpeak Interactive Corp. of Del.*, 777 F.3d at 669; *Evans*, 80 F.3d at 963.

Here, the County argues that plaintiff was required to file his charges within 240 days, rather than 300 days, because he "makes no allegation that he has filed either of his EEOC charges with [the] Maryland" Commission on Civil Rights. ECF 17-1 at 4 n.2. And, defendant argues that plaintiff failed to file his first and second charges within the 240-day timeframe. *Id*. at 5. The County's argument is without merit.

As indicated, Maryland is a "deferral" jurisdiction, and the 300-day filing period applies when a party files a charge with the Maryland Commission on Civil Rights. *See* 42 U.S.C. § 2000e-5(e)(1); *Edelman*, 300 F.3d at 404 & n.3; *see also, e.g.*, *Dewitt*, 2017 WL 3116609, at *3. Plaintiff incorporated his First Charge (ECF 1-1) and his Second Charge (ECF 14-3) into his Amended Complaint. *See* ECF 14-2 at 4-5 (citing and quoting ECF 1-1); *see also* ECF 14-2 at 25 (citing and discussing ECF 14-3). Each Charge plainly indicates, on its face, that it was filed with the "Maryland Commission on Human Relations" (*see* ECF 1-1; ECF 14-3), the predecessor to the Maryland Commission on Civil Rights. *See* 2011 Md. Laws, Chap. 580 (approving a change of name from the Commission on Human Relations to the Commission on Civil Rights). Accordingly, plaintiff filed both Charges with the appropriate State agency. Therefore, his ADA claims are subject to a 300-day limitations period.

As noted, plaintiff filed the First Charge on an unspecified day in January 2011 (ECF 14-2 at 4-5; *see also* ECF 1-1), alleging retaliation, harassment, and disability discrimination under the ADA. *See* ECF 1-1. Even assuming that the First Charge was filed on January 1, 2011, the 300-day filing period would encompass events dating to March 7, 2010. And, if the Charge were filed on January 31, 2011, the filing period would encompass events dating to April 6, 2010. As indicated, the First Charge stated that the "[l]atest" date of discrimination was November 1, 2010. *See* ECF 1-1.

As indicated, on November 1, 2010, plaintiff was terminated from his position in the Division of Litter Control. ECF 14-2 at 21. Regardless of the date in January 2011 that plaintiff filed the First Charge, the date of November 1, 2010, is within the 300-day filing period. Moreover, the First Charge described "harassment" following the May 2010 Rutherford

Mediation;[13] complained as to a letter mailed to plaintiff's parents in May 2010; and complained about a meeting on September 3, 2010, in which plaintiff's designated advocate was absent. *See* ECF 1-1. All of these events are within the 300-day filing period, regardless of which date in January 2011 Magness filed the First Charge.[14]

The Second Charge was filed on an unspecified day in August 2016. *See* ECF 14-2 at 25. In his Reply, plaintiff states that the Second Charge was filed on August 26, 2016. *See* ECF 18 at 7. For the purpose of this Motion, I shall proceed under the assumption that the Second Charge was, indeed, filed on August 26, 2016. Therefore, the 300-day limitations period as to the Second Charge encompasses conduct dating to October 31, 2015.

Plaintiff was again terminated from his employment with the County in July 2015, when the County outsourced positions within the Division of Litter Control. *See* ECF 14-2 at 23. The Amended Complaint does not expressly identify the July 2015 termination as an adverse employment action. *See* ECF 14-2 at 23-28. Rather, in the Amended Complaint, plaintiff alleged that "discrimination and retaliation against Mr. Magness included the following material adverse employment actions: . . . refusing to rehire him after his termination from employment in July 2015 . . . ." ECF 14-2 at 27. In any event, plaintiff's termination in July 2015 falls outside

---

[13] The "harassment" alleged in the First Charge (*see* ECF 1-1) appears to form the basis for plaintiff's ADA claim of hostile work environment. *See* ECF 14-2 at 27; *see also* ECF 1-2 at 3. As noted, it is not clear whether the Second Charge also raised a claim of hostile work environment. *See* ECF 14-2 at 27; *see also* ECF 14-3. But, defendant does not challenge the hostile work environment claim in the context of the First or Second Charge.

[14] I note that the First Charge also stated that the "[e]arliest" date of discrimination was January 1, 2007. The portion of the First Charge dedicated to the "particulars" stated, ECF 1-1: "Beginning in 2007, I was continuously harassed by supervisors and co-workers." In the Motion, the County does not challenge the timeliness of the First Charge on the basis of allegations of harassment dating to 2007. Because the issue has not been raised or briefed, I decline to resolve it here.

the limitations period of October 31, 2015 through August 26, 2016.  But, that does not end the inquiry.

After plaintiff's termination in July 2015, he submitted formal applications for nine positions with the County.  *See* ECF 1-4.  Plaintiff avers that he was qualified for these positions, and that the County failed to select him "because of his disability and in retaliation for objecting to and reporting the disability harassment and discrimination" against plaintiff by County employees.  ECF 14-2 at 24.  In its Motion, defendant contends that all but two of these applications are time-barred.  ECF 17 at 4.  In particular, the County does not dispute that applications submitted by plaintiff on June 6, 2016, and December 23, 2015 were timely raised by the Second Charge.  *See id*.

To be sure, plaintiff applied for multiple positions between August 22, 2012 and August 13, 2015.  ECF 1-4 at 3-5.  These applications were completed outside of the limitations period for the Second Charge.  However, of the nine employment applications, seven were completed after the operative date of October 31, 2015.  *See* ECF 1-4 at 2-3 (applications dated December 23, 2015; June 6, 2016; two applications dated August 1, 2016; and three applications dated August 12, 2016).  Accordingly, the Second Charge was timely filed as to these seven applications.

Magness asserts that the ADA claim of retaliation raised in the Second Charge may properly include any unsuccessful employment application submitted by plaintiff *after* the First Charge in January 2011.  In support of his argument, plaintiff points, *inter alia*, to the case of *Nealson v. Stone*, 958 F.2d 584 (4th Cir. 1992).  As indicated, defendant contends that all but two of these applications are time-barred.  ECF 17 at 4.

The plaintiff in *Nealson* filed a charge of discrimination alleging gender-based pay discrimination against her employer, the U.S. Army. 958 F.2d at 586. The EEOC initially found that there was reasonable cause to believe that the Army had discriminated against the plaintiff, but then reversed its position nearly two years later. *Id.* Thereafter, the plaintiff filed suit against the Army, alleging that she had been retaliated against by the Army for filing the initial charge. *Id.* at 590. Notably, this claim of retaliation had not been raised in any charge of discrimination. *Id.* However, the Fourth Circuit stated that suit "'may extend to any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission.'" *Id.* (quoting *Hill v. Western Electric Co.*, 672 F.2d 381, 390 n.6 (4th Cir. 1982)). The Court noted that "retaliation for the filing of an EEOC charge" constitutes "discrimination 'like or reasonably related to . . . and growing out of such allegations.'" *Id.* (alteration in *Nealson*) (quoting *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir. 1989)). Accordingly, the Fourth Circuit stated that "a separate administrative charge is not prerequisite to a suit complaining about retaliation for filing the first charge." *Id.* Therefore, the Fourth Circuit concluded that the plaintiff was "entitled to have her retaliation claim heard by the district court," even though she had not raised the retaliation claim in a previous charge of discrimination. *Id.*

Additionally, in *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 301-304 (4th Cir. 2009), the Fourth Circuit determined that a retaliation claim that is reasonably related to the allegations made in a prior EEOC charge, and that pertains to conduct that occurred *after* the earlier EEOC charge had been filed, need not be alleged in a new EEOC charge. *See also Tillbery v. Kent Island Yacht Club, Inc.*, CCB-9-2956, 2010 WL 2292499, at *6 (D. Md. June 4, 2010) ("A retaliation claim may be raised for the first time in federal court by relating back to a previous

EEOC charge so long as the retaliatory conduct complained of occurred *after* the EEOC charge was filed [and] . . . the EEOC charge is 'properly' before the court.") (internal citations omitted), *aff'd*, 461 F. App'x 288 (4th Cir. 2012).

As noted, plaintiff timely filed the First Charge in January 2011. And, each application listed in ECF 1-4 was completed by plaintiff *after* that date. *See* ECF 1-4 (noting that the earliest of the seventeen application is dated August 22, 2012). Moreover, plaintiff claims that the County failed to hire him in retaliation for filing the First Charge. *See* ECF 14-2 at 23-28. Although plaintiff raised this retaliation claim in his Second Charge (*see* ECF 14-3), the retaliation claim relates back to the First Charge and pertains to applications submitted *after* the First Charge was filed. Therefore, it is properly before the Court.

Accordingly, Magness may use any application submitted *after* the First Charge as evidence supportive of the ADA claim that defendant failed to rehire him in retaliation for the First Charge. However, any application submitted before October 31, 2015, is untimely as to any ADA claim of discrimination based on disability or hostile work environment, to the extent such a claim is even raised by the Second Charge.

## 2. The Rehabilitation Act

Section 504(a) of the Rehabilitation Act, codified, as amended, at 29 U.S.C. § 794(a), provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

The Rehabilitation Act was enacted seventeen years prior to the ADA. Title II of the ADA is closely related to § 504 of the Rehabilitation Act, and to "the extent possible, [courts] construe similar provisions in the two statutes consistently." *Freilich v. Upper Chesapeake*

*Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002); *see Seremeth*, 673 F.3d at 336 n.1 ("Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is 'substantially the same.'") (citation omitted); *Rogers v. Dept. of Health & Env'l Control*, 174 F.3d 431, 433-34 (4th Cir. 1999) (stating that courts may apply Rehabilitation Act precedent in interpreting the ADA, and vice versa).

Indeed, the statutes "share the same definitions of disability," *Rogers*, 174 F.3d at 433, and Title II of the ADA explicitly provides that "[t]he remedies, procedures, and rights" provided under § 504 of the Rehabilitation Act "shall be the remedies, procedures, and rights [that Title II of the ADA] provides to any person alleging discrimination on the basis of disability. . . ." 42 U.S.C. § 12133. In turn, the Rehabilitation Act incorporates by reference the "remedies, procedures, and rights" established by Title VI of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000d *et seq.*), which prohibits discrimination on the basis of race, color, or national origin by recipients of federal financial assistance. 29 U.S.C. § 794a(a)(2). Accordingly, courts look to Title VI precedent to resolve remedial and procedural issues arising in Rehabilitation Act and ADA Title II cases.

Despite the general congruence of Title II of the ADA and § 504 of the Rehabilitation Act, a plaintiff must show a different "causative link between discrimination and adverse action" under the two statutes. *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999). Under Title II of the ADA, a plaintiff need only prove discrimination "by reason of" disability. 42 U.S.C. § 12132. But, a successful Rehabilitation Act claim requires a showing of discrimination "*solely* by reason of" disability. 29 U.S.C. § 794(a) (emphasis added); *see Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 n.17 (4th Cir. 2005) ("[W]e have

recognized that the causation standards under Title II of the ADA and § 504 of the Rehabilitation Act are 'significantly dissimilar.'") (quoting *Baird*, 192 F.3d at 469).

Here, the County incorrectly asserts that the "administrative exhaustion and filing requirements of . . . the Rehabilitation Act are identical to those of Title VII." ECF 17-1 at 4. It is well settled that the Rehabilitation Act does not require administrative exhaustion by non-federal employees.[15] *See Bowman-Cook v. Wash. Metro. Area Transit Auth.*, DKC-14-1877, 2017 WL 3592450, at *5 n.4 (D. Md. Aug. 21, 2017) ("Non-federal employees are not required to exhaust any administrative remedies under the Rehabilitation Act . . . ."); *Harris v. O'Malley*, WDQ-13-2579, 2015 WL 996557, at *5 (D. Md. Mar. 4, 2015) ("'[C]ourts have uniformly held that non-federal employees need not exhaust administrative remedies before bringing a private action under Section 504'" of the Rehabilitation Act) (citation omitted); *see also Raiford v. Md. Dep't of Juvenile Serv's*, DKC-12-3795, 2014 WL 4269076, at *7 n.7 (D. Md. Aug. 28, 2014) (stating that, in the context of a Section 504 claim brought by a non-federal employee, the "Rehabilitation Act—unlike the ADA—has no administrative exhaustion requirement"). *See generally Lucas*, 822 F. Supp. 2d at 603-04 ("[N]on-federal employees need not exhaust administrative remedies before bringing a private action under Section 504 of the Rehabilitation Act.") (citing, *inter alia*, *Freed v. Consol. Rail Corp.*, 201 F.3d 188, 193 (3d Cir. 2000); *Brennan v. King*, 139 F.3d 258, 268 n.12 (1st Cir. 1998); *Tuck v. HCA Health Servs. of Tenn., Inc.*, 7 F.3d 465, 470-71 (6th Cir. 1993); *Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990); *Miener v.*

---

[15] Federal employees must administratively exhaust a Rehabilitation Act claim before lodging a complaint under that statute. The Fourth Circuit has said that "Rehabilitation Act claims against the federal government must comply with the same administrative procedures that govern federal employee Title VII claims." *Wilkinson v. Rumsfeld*, 100 F. App'x 155, 157 (4th Cir. 2004) (citing *Doe v. Garrett*, 903 F.2d 1455, 1460-61 (11th Cir. 1990)); *see Garrett*, 903 F.2d at 1460-61 (stating that a Rehabilitation Act claim brought by a federal employee under 29 U.S.C. § 791 is modeled on Title VII and must be exhausted, but a claim under 29 U.S.C. § 794, which is modeled on Title VI, need not be exhausted).

*Missouri*, 673 F.2d 969, 978 (8th Cir. 1982); *Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372, 1381-82 (10th Cir. 1981); and *Lloyd v. Reg'l Transp. Auth.*, 548 F.2d 1277, 1287 (7th Cir. 1977)). Therefore, plaintiff is not required to administratively exhaust his Rehabilitation Act claims.

Moreover, the Rehabilitation Act does not specify a limitations period. Because of this, courts "borrow" the most appropriate or analogous state statute of limitations and apply it to claims lodged under the Rehabilitation Act. *See A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011). Accordingly, "the applicable limitations period depends on the most analogous state-law claim or statutory scheme." *Bales v. Maryland Judiciary/Administrative Office of the Courts*, JFM-15-3293, 2016 WL 6879902, at *6 (D. Md. Nov. 22, 2016).

Courts in Maryland have often applied "the three-year limitations period governing general civil actions to [] Rehabilitation Act claims.'" *Bowman-Cook*, 2017 WL 3592450, at *5 (alteration in *Bowman-Cook*) (quoting *Jeandron v. Bd. of Regents of Univ. Sys. of Md.*, 510 F. App'x 223, 226 (4th Cir. 2013)); *see also Schalk v. Associated Anesthesiology Practice*, 316 F. Supp. 2d 244, 251 (D. Md. 2004). However, the Maryland Fair Employment Practices Act ("MFEPA") prohibits employment discrimination based on disability. *See* Md. Code (2014 Repl. Vol., 2017 Supp.), §§ 20-601(a)(2), 20-602(2), 20-606(a) of the State Government Article ("S.G."). According to Judge J. Frederick Motz of this District, the "MFEPA is the most analogous state law to the Rehabilitation Act." *Bales*, 2016 WL 6879902, at *7. Notably, S.G. § 20-1013(a)(3) states that a civil action under the MFEPA must be "filed within 2 years after the alleged unlawful employment practice occurred."

Accordingly, I conclude that the applicable statute of limitations period for plaintiff's Rehabilitation Act claim is the analogous two-year period found in S.G. § 20-1013(a)(3). *See*

*also Bales*, 2016 WL 6879902, at *7 (concluding that the two-year limitations period under the MFEPA applies to a claim lodged under the Rehabilitation Act).

Plaintiff's initial Complaint was filed on August 25, 2016. ECF 1. Therefore, facts dating back to August 25, 2014, were timely raised for the purpose of the Rehabilitation Act claims. The Amended Complaint was filed on May 18, 2017. ECF 14. Even assuming, *arguendo*, that the Second Charge does not relate back to the First Charge, the Rehabilitation Act claims lodged by the Amended Complaint are timely as to events occurring between May 18, 2015, and May 18, 2017.[16] And, I conclude that plaintiff's Rehabilitation Act claims are timely filed as to events occurring between August 25, 2014, and May 18, 2017.

### 3. Plaintiff's Smoke Allergy

The County argues that a "smoke allergy" is not a "disability" under the ADA or Rehabilitation Act, and that a claim of discrimination based on plaintiff's smoke allergy must therefore be dismissed. *See* ECF 17-1 at 7-8. In his Opposition, plaintiff states that he is "not asserting a separate disability discrimination claim based on a smoke allergy." ECF 18 at 9. Rather, plaintiff's smoke allergy serves as "background evidence" to his claims of "harassment and retaliation." *Id.* at 9. Magness avers only that County employees "blew smoke in Plaintiff's face and exposed him to smoke to taunt and tease him . . . ." *Id.* at 8-9; *see also* ECF 14-2. Accordingly, I agree with plaintiff that "[t]here is no smoke allergy disability claim to dismiss."

### B. The Surreply Motion

In its Reply, the County argues for the first time that the Amended Complaint fails to state a prima facie claim of retaliation under the ADA. *See* ECF 19 at 7. Plaintiff subsequently filed the Surreply Motion (ECF 20), noting that the Motion (ECF 17) did not raise the issue of

---

[16] The parties do not address the relation back doctrine in the context of plaintiff's Rehabilitation Act claims. *See* ECF 17; ECF 18.

whether Magness stated a claim of retaliation under the ADA.  ECF 20 at 1.  Therefore, Magness sought leave "to file a Surreply in the event that the Court considers the new argument raised by Defendant" in its Reply.  *Id.* at 2.  As noted, the County has not filed a response in opposition to the Surreply Motion.  *See* Docket.

Local Rule 105.2.a provides that a party is not permitted to file a surreply without permission of the court.  The filing of a surreply "is within the Court's discretion, *see* Local Rule 105.2.a., but they are generally disfavored."  *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013), *aff'd in part*, 778 F.3d 463 (4th Cir. 2015); *see also, e.g.*, *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 679 (D. Md. 2013).  A surreply may be permitted when the party seeking to file the surreply "would be unable to contest matters presented to the court for the first time" in the opposing party's reply.  *Clear Channel Outdoor, Inc. v. Mayor & City Council of Balt.*, 22 F. Supp. 3d 519, 529 (D. Md. 2014) (quotations and citations omitted).  However, a surreply is not generally permitted where the reply is merely responsive to an issue raised in the opposition.  *See Khoury v. Meserve*, 268 F. Supp. 2d 600, 605-06 (D. Md. 2003).

When "contentions appear for the first time in [a] reply brief, the court is inclined not to consider them."  *Humane Soc'y of the United States v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, DKC-13-1822, 2016 WL 3668028, at *4 (D. Md. July 11, 2016) (citing *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006)) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.").

The County uses its Reply to argue for the first time that the Amended Complaint fails to allege a prima facie claim of retaliation under the ADA.  *See* ECF 19 at 6-8.  Because the County raises this argument in its Reply, I shall not consider it within the context of this Memorandum

Opinion.  Even if I were to consider the argument, I would conclude that it lacks merit.

Accordingly, I need not consider a surreply and shall deny plaintiff's Surreply Motion (ECF 20), as moot.

## IV.    Conclusion

Consistent with the foregoing reasons, defendant's Motion is denied in part and granted in part.  Additionally, plaintiff's Surreply Motion is denied, as moot.  An Order follows.


Date:  March 27, 2018                                                    _____/s/_____
                                                                        Ellen Lipton Hollander
                                                                        United States District Judge